[No. 19965. *En Banc.* November 17, 1926.]

*In the Matter of the Estate of* GEORGE AMPUSAIT, *Deceased.*[1]

[1] APPEAL (145, 148)—PRESERVATION OF GROUNDS—EXCEPTIONS— NECESSITY. The record being silent as to any notice of the presentation of findings of fact, and notice and presence being denied, the statement of facts will not be struck out for failure to file exceptions within five days, as the record should clearly show failure to comply with the statute.

[2] DESCENT AND DISTRIBUTION (11)—ESTABLISHMENT OF HEIRSHIP— EVIDENCE—SUFFICIENCY. The evidence is insufficient to sustain findings that Geo. Ampusait, deceased at Circle, Alaska, in 1924, about 70 years of age, was the person of the same name, who, in 1889, was the father of an illegitimate child; though of corresponding age for that time, and notwithstanding the last named went to Alaska, when there was no proof of identification or of similar physical characteristics and nothing had been heard from the father for over thirty years, and there was little similarity between the hand-writing of the two persons (MAIN and ASKREN, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Griffiths, J., entered November 21, 1925, in probate upon findings in favor of an alleged heir to a decedent's estate. Reversed.

[1]Reported in 250 Pac. 463.

*Robert Grass, Kazis Krauczunas, George B. Cole* and *John Wesley Dolby,* for appellants.

*Borden & Gaylord* and *Wright & Catlett,* for respondent.

Tolman, C. J.—Respondent seeks in this proceeding to establish the fact that she is the daughter (and sole heir) of the deceased, born as the fruit of his adultery with a married woman more than thirty-five years ago.

The trial court found in her favor and the state, claiming an escheat, and others claiming to be collateral heirs of the deceased, have appealed.

[1] As a preliminary, respondent moves to strike the statement of facts, because, as claimed, no exceptions were taken to the findings and conclusions of the trial court within the statutory time. The record seems to be silent as to any notice of the presentation of the findings to the court for signature or of the filing. Respondent contends that a notice was given, fixing November 10 as the day such findings would be presented, but admits that, by reason of the absence of the judge, they were not presented until November 21, asserting that all parties were then present. Counsel for the state denies having had any notice or knowledge of such presentation, denies that he was present when the findings were signed, and asserts that his exceptions were filed within five days after he learned of the signing. We think such a motion should not be granted, unless the record clearly shows a failure to comply with the statute, and therefore the motion is denied.

The birth of respondent on September 12, 1890, is clearly established, as is also the identity of her mother, and the fact that the mother, since 1884, has at all times been the wife of another whose name she

has always borne, and with whom she has lived all these years as a wife.

Much of the evidence is of a very unsatisfactory nature, as perhaps must always be the case when the memory of witnesses is depended upon for the proof of facts which happened so long ago.

[2] Briefly stated, the mother's story is substantially this: She was married when fourteen years of age and lived upon a little farm with her husband. Two children were born to them. In the summer or fall of 1889, the husband, in order to improve his condition financially, accepted employment as a hop-buyer and left home, remaining away for a number of months. The husband and wife corresponded, and the husband sent of his earnings to support the wife on the little farm. When he went away, the husband left a hired man on the farm with his wife to do the rough work, and after a time, this man proving to be unsatisfactory to the wife, she so informed her husband and obtained his consent to discharge him and employ another. This, in the husband's absence, she did, and the man whom she employed was known as George Ampusait, who came to the farm, perhaps about November 1, 1889. The man proved kindly, sympathetic and helpful, and she became intimate with him. Their illicit relations continued some months, until she became aware that she was pregnant.

As soon as she was certain of that fact, she sent Ampusait away and wrote to her husband, confessing the situation and asking him to return. The husband did not return at once, but through correspondence made known to her that he felt in part to blame by reason of the condition in which he had left her and that he would forgive her. Apparently, the husband returned for a brief visit in May, 1890, but in a few

days went back to his employment, and did not again return until after the baby was born.

The mother is very vague in her description of the George Ampusait who she claims was the father of her child. She says that he was a man considerably older than she, perhaps thirty-five or forty years old, of dark complexion, who spoke broken English, and she always assumed, without knowing, that he was German. When questioned as to the color of his eyes, she was unable to tell, or give, any other than the very general description which we have just noted. She did say, in effect, that, while she did not know what the color of his eyes might have been, yet as he was a dark man, she presumed his eyes were dark.

The mother claims never to have seen or heard from the father of the child from the time she sent him from the farm until the year 1895, when she was in Portland with her children, and while there at breakfast in a restaurant she testified that George Ampusait came in, recognized her, that Iola was pointed out as his child, and he then, for the first time, knew certainly that a child had been born as a result of their relations; that at that time he professed to be interested in the child and indicated that he would continue to be so interested, and gave the mother a small sum of money to be used for the child. He was then told by the mother what her address would be and, according to her testimony, during the next few years she received four letters from him, each containing a small sum of money to be used for the child, the last of which letters was dated Nome, Alaska, July 10, 1899. This letter and a scrap from another and earlier one were produced and offered in evidence.

After the receipt of this letter, the mother heard no more from the father of the child, knew nothing of his whereabouts or condition, and sought to know nothing,

until she read in a newspaper an account of the death of a man in Alaska, the headline of the article being, "MINER DIES WITH $150,000 AND NO HEIRS," and the first paragraph continues:

"With no heirs to enjoy his $150,000 fortune, won after a life-time battle with the elements, the body of George Ampusait, 70, of Oakland, lies frozen in a snow-drift along the trail near Circle, Alaska, fifty miles from Fairbanks."

Other witnesses, who knew the man George Ampusait who worked on the ranch when the claimant was begotten, described him as a young man, twenty-four or twenty-five years of age, but none give any description of his physical characteristics. One of these witnesses testified that he had so known George Ampusait in the latter '80's, and that later, while he was engaged in the stevedoring business on the Tacoma waterfront, he employed this same George Ampusait for a time in his operations; and that in the spring or summer of 1895 or 1896, having just completed the loading of a ship which was to be towed to Seattle for further cargo, Ampusait, who had been employed in the loading, came to him, asked for paper and a pencil, and proceeded to write a letter, the scrap of which is introduced in evidence, stating at the same time that Iola was his daughter, that he desired to send money to the mother for her use, that he was going on to Seattle on the ship and thence to Alaska, and asked the witness to take certain money which he then gave him with the letter, change it into a bill, enclose it in the letter and mail it to the mother; all of which the witness did.

It will be perceived that so far there is no identification whatever of the George Ampusait of 1889 to 1895, or even to July 10, 1899, with the George Ampusait who died at Circle in 1924. The respondent produced nothing whatever in the way of evidence of identification,

save only the name and the letters referred to, and the fact that one of them was written from Nome, Alaska. It is perhaps unusual, but not unknown, for men to abandon one name and assume another. Cases of similarity of names of persons of no known relationship to each other do occur, and the same name in different branches of a family is of so frequent occurrence as to excite no great surprise. The name is a circumstance to be considered, and if the deceased had lived and died at Nome, perhaps that would have sufficed. But the distance from Nome to Circle is so great, the lapse of time so considerable and the disposition and circumstances of the man who was the father, so entirely unknown, that we think no presumption is raised that the George Ampusait of Nome was the George Ampusait of Circle twenty-five years later.

There is nothing in the contents of the letters that is of any assistance to us. The scrap of letter referred to is illegible to us, but as counsel interprets it, it contains a portion of the mother's name, then the words, "Ten dollars for little Jola. I told Bass to-day she was my daughter. This world is dark for me. May I claim her some time." Then on the reverse side, "You. I ask Bass will mail this for me. Jola is my all in this world. (signed) Geo. Ampusait." The letter from Nome is of much the same import; speaks of twenty dollars being enclosed for the daughter Jola; asks that she be well cared for and says he will pay for the trouble; that he is leaving on a prospecting trip and will send more money on his return. This latter letter is more legible, and the signature is quite so.

The administrator took the stand as a witness against the respondent and testified that he had known the deceased quite well, done considerable business for him and carried on quite an extended correspondence with him over a number of years preceding his death.

He described the deceased as a man some seventy to seventy-three years of age (which would correspond with the age fixed by the mother of the respondent, but not with that testified to by her other witness), that he had snow-white hair, blue eyes and a ruddy complexion —none of which helps in the identification; that he was familiar with the handwriting of the deceased and that, in his opinion, the letters introduced and relied upon by the respondent were not written or signed by the deceased. He identified and introduced in evidence a number of letters written by the deceased and his signature to a document, dated as early as August 8, 1913. The trial court seemed to find some similarity between these acknowledged writings of the deceased and the writings of George Ampusait the father of the claimant; but we confess we find little, if any, similarity. If any there be, it is only that the documents, in every case, were written by an uneducated person with a faulty knowledge of the English language.

The trial court said, in summing up: "It seems to me that the court ought to be very slow in letting the apparent differences in writing overcome positive testimony, or what is virtually positive testimony, of the living witnesses." But we fear at that point the court had overlooked the fact that no living witness, by any sort of testimony, in any manner at all connected George Ampusait, the father, with George Ampusait, the deceased; and, as we see it, the writings are the only possible evidence of identity now disclosed by the record.

Identity is a fact to be proved like any other fact, and the burden of proof is upon the claimant. Unsatisfactory though it be, the evidence may be sufficient to establish the illegitimate birth of the respondent, and that a person then known as George Ampusait was in fact her father. The letters referred to may be held to

be a sufficient acknowledgment of his paternity upon his part to satisfy the statute, when considered in the light of the testimony given by presumably disinterested witnesses but there the proof ends, and simply because that George Ampusait announced that he was going to Alaska and that a letter from him was afterwards received, dated Nome, Alaska, we do not feel justified in drawing the inference that the writer of the letters was the man who died in Circle, in 1924; the more so that by way of defense it was shown that George Ampusait the deceased had for years made his home at Oakland, California, apparently residing there for a portion of each year, when not in Alaska; had business and business associations or connections in the city of Seattle; and it would seem that, had he been the writer of the Nome letter, he would in later years have made inquiry for his child, the indications being that she would not have been hard to trace.  We feel bound to hold, as a matter of fact, that the respondent failed in her proof in that she did not establish that the decedent was her father.

The conclusion we have reached on the question of identity makes it unnecessary to consider the many other points raised and discussed by counsel.  We are constrained to hold that respondent failed in her proof, and that her petition should have been dismissed.

Reversed, with directions to dismiss.

FULLERTON, PARKER, HOLCOMB, BRIDGES, and MITCHELL, JJ., concur.

MAIN, J. (dissenting)—As I understand the evidence in this case, it sustains the holding of the trial court and for that reason the judgment should be affirmed. I therefore dissent.

ASKREN, J., concurs with MAIN, J.